JOSEPH EDWARD KOZA, Appellant, *v.*
THE STATE OF NEVADA, Respondent.

No. 14243

April 25, 1984                                        681 P.2d 44

---

[Rehearing denied April 4, 1985]

*Goodman, Terry, Stein & Quintana,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Robert J. Miller,* District Attorney, *James Tufteland,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

A jury convicted Joseph Edward Koza of first degree murder with the use of a deadly weapon and robbery with the use of a deadly weapon and returned a verdict of life imprisonment without the possibility of parole on the murder count. The district court sentenced Koza to fifteen years imprisonment on the robbery count. The district court also imposed additional enhancement penalties of fifteen years and life imprisonment without the possibility of parole for the use of a deadly weapon in the commission of the crimes. The sentences are to run consecutively. Our review of the record convinces us that Koza was fairly tried, convicted and sentenced. We therefore affirm.

Shortly after midnight on October 25, 1980, a man driving home from work spotted a taxicab which had been driven off the pavement and into a large bush. Behind the cab, which was in a remote area on the outskirts of Las Vegas near Sunset Road, the man found a body on the ground.

An autopsy revealed that the victim, the cab's driver, died of two .25 caliber gunshot wounds to the back of the head. The cab company supervisor also discovered a .25 caliber shell casing under the back seat of the cab. Although the cabdriver's

trip sheet reported $76.85 in fares for the evening, no money was found on his body or in the cab's safe. The cab's meter was still running when police arrived. Several latent fingerprints were recovered from the cab.

Immediately prior to his death, the cabdriver was on duty and following his normal routine of "working the Las Vegas Strip," instead of taking dispatch calls. He picked up four passengers at the Riviera Hotel at 9:52 p.m. and left them at the Tropicana Hotel. His trip sheet's final entry noted that at 10:02 p.m. he picked up two persons. Contrary to routine practice, the cabdriver did not indicate where the persons were picked up or where they wanted to go. Subsequent to the police investigation, the cab company supervisor, using information from the abandoned cab's running meter and from three alternative routes (each driven on a Friday at 10:00 p.m.) from the Tropicana Hotel to where the cab was found, calculated that the cabdriver had arrived at the scene at approximately 10:15 p.m. the night he was killed.

The evening of the killing, David Berry was driving his truck on Sunset Road with his friend Albert Smith and their girlfriends. The hour was sometime between 10:15 p.m. and 10:30 p.m. Berry passed a man and a woman walking along at a point approximately one-half mile from where the body was found. Seeing the man put his thumb out, Berry backed up to give them a ride. Smith rolled down the passenger window, turned his head to look at the man and asked him if they wanted a ride. The man, who stood about five feet from Smith, replied affirmatively and indicated that they were going to "the Tropicana." There were no streetlights in that area, but Smith saw the man's face from the illumination provided by Berry's truck lights and by the lights of an approaching car. When Berry later let the hitchhikers out, he "got a good look" at the man as he helped the woman out of the truck. There were streetlights in the area where the two disembarked.

On November 12, 1980, Berry and Smith and their girlfriends met with police detectives. Berry was separated from the others and interviewed. After he briefly described the hitchhiker, police conducted a photo lineup containing six photographs. Berry "positively" identified the picture of Koza as the hitchhiker. The procedure was repeated for Smith, who also identified Koza's photograph. Berry and Smith later identified Koza at preliminary hearings and at trial. Neither Berry nor Smith could identify the woman hitchhiker, but their general descriptions matched that of Koza's wife.

Prior to being charged with the instant crimes, Koza and his wife had been arrested on unrelated charges at a motel where

they were registered under a false name. Their registration card listed no motor vehicle and the motel clerk testified that he had never seen Koza or his wife in a private car, only in taxicabs. Koza and his wife had stayed at the motel for over two months and had paid their rent daily in cash. The motel is approximately one block east of the Tropicana Hotel.

The arrests were precipitated by the motel desk clerk's inadvertent overhearing of a portion of a telephone conversation between a man in room 359 and an outside female caller. The caller inquired, "Do you have your gun?" The desk clerk, who was also the motel's manager, listened one or two minutes thereafter for security reasons and heard the following:

> Female: Do you have your gun?
>
> Male: Yes, I have mine; do you have yours?
>
> Female: Yes, I have mine in my purse. I am over here now, and here is what we will do. On the way over, I will sit in the back seat of the car; and when we get to the rear of the hotel I will get the drop on them.
>
> Male: Be careful, there are two of them.
>
> Female: Don't worry. If they try anything I will blow their brains out. I will have him toot the horn, and that will be your signal to come around and get into the car.

Suspecting a robbery might soon occur on the premises, the desk clerk called the motel owner and then the police.

Police officers arrived thirty to forty-five minutes later and commenced surveillance of room 359. During the next two hours, a man later identified as Koza twice left the room, went to the rear of the motel and returned. He appeared as if he was looking for someone. After a third trip to the front of the motel, he returned to the room with a woman later identified as Koza's wife. At that time the officers decided to investigate. Sergeant Schaub knocked on the door and announced they were police officers who wanted to speak with the occupants. Schaub then heard from inside the room the sound of a slide action of an automatic pistol. Schaub immediately shouted to the other officers to take cover. He then shouted to the occupants of room 359 that he knew someone in the room had a gun and that unless everyone exited, police officers would come in shooting.

Approximately one minute later the door opened slightly and Koza's wife appeared. Schaub ordered her to come out; she did not. She asked what he wanted and said nobody else was inside. Schaub raised his gun and again ordered her to come out. She then exited through the narrowly opened door. The officers searched her, found no weapons, handcuffed and

arrested her. Knowing that at least one man was still in the room, Schaub shouted that he knew someone else was inside and ordered him to come out. After one or two minutes, Koza emerged. Police found a small holster clipped to his pants' waistband, but no gun. The Kozas were arrested for conspiracy to commit robbery.

Schaub and the other officer then entered the room and commenced a "protective sweep." No one was found in the main area of the room or in the bathroom. While returning to the main area, Schaub noticed one bed's mattress was not aligned with the box springs. He could see a portion of a chrome object hidden between the mattress and box springs. Bending down, he could see more of the object and "just knew" that it was a gun. Schaub lifted the mattress and confirmed that the object was a gun. It was a Raven .25 caliber automatic handgun with a live round in its chamber. Two other guns were also found. Only the Raven fit Koza's holster.

A firearms examiner conducted tests with the guns seized in Koza's room. He concluded, with "one hundred percent" certainty, that the bullets recovered during the cabdriver's autopsy and the cartridge found in the cab were fired from the Raven pistol. The next day, fingerprint experts discovered that a latent palm print recovered from the fender of the victim's cab matched the palm print of Koza's wife.

An information jointly charged Koza and his wife with murder and robbery, both counts with the use of a deadly weapon. The jury found Koza guilty of first degree murder and robbery, both with the use of a deadly weapon. Although the state sought the death penalty, the jury concluded the penalty phase of the trial by returning a verdict for life imprisonment without the possibility of parole. Koza was sentenced to two consecutive life sentences without the possibility of parole for his conviction of first degree murder with the use of a deadly weapon and two consecutive fifteen-year terms of imprisonment for his conviction of robbery with the use of a deadly weapon. Koza now appeals from each of his convictions and sentences.

Koza first contends that the record does not contain sufficient evidence for a rational trier of fact to be convinced beyond a reasonable doubt of his guilt. The relevant inquiry for this Court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); Hern v. State, 97 Nev. 529, 531, 635 P.2d 278, 279 (1981). The testimony placing Koza

near the scene of the crime at the approximate time of its occurrence and the evidence proving that the gun found under Koza's mattress, which fit Koza's holster, was the murder weapon are especially damaging to Koza's position. We conclude that there is substantial evidence in the record to support the verdict of the jury and therefore will not overturn it on appeal. *Id*.

Koza next contends that the district court's refusal to suppress the photo lineup identifications violated his due process rights. Koza relies on Manson v. Brathwaite, 432 U.S. 98 (1977) for his contention that the suggestiveness of the photo lineup outweighed the reliability of Smith's and Berry's identifications. We have considered the manner in which the police conducted the photo lineup and have examined the six pictures displayed and conclude the identification procedure was not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id*. at 105 n. 8, quoting Simmons v. United States, 390 U.S. 377, 384 (1968). The district court, therefore, did not err by refusing to suppress the photo lineup identifications.

Koza's third argument is that his arrest and the search of his motel room and seizure of evidence found therein were products of an unlawful interception of a private communication by wire. Koza maintains, as he did at a pretrial suppression hearing, that NRS 179.465(2) implicitly prohibited the motel desk clerk's disclosure of the contents of the overheard telephone conversation. More directly on point, however, is NRS 200.630 which explicitly prohibits disclosure and recognizes the same statutory exceptions listed in NRS 179.465(2).[1] NRS 200.630(2)

---

[1]NRS 200.630 provides:

> 200.630   Disclosure of contents or substance of wire or radio communication prohibited; exceptions.
> 1.   Except as otherwise provided in NRS 179.410 to 179.515, inclusive, no person shall disclose the existence, contents, substance, purport, effect or meaning of any wire or radio communication to any person unless authorized to do so by either the sender or receiver.
> 2.   This section shall not apply to any person, or the officers, employees or agents of any person, engaged in furnishing service or facilities for such communication where such disclosure is made:
> (a) For the purpose of construction, maintenance, conduct or operation of the service or facilities of such person; or
> (b) To the intended receiver, his agent or attorney; or
> (c) In response to a subpena issued by a court of competent jurisdiction; or
> (d) On written demand of other lawful authority.

nevertheless creates an exception for persons engaged in the business of providing service and facilities for such communication where the interception is to operate the service or facilities. We construe this statute to include employees performing hotel and motel switchboard operations. Here, the district court at the suppression hearing specifically found that the desk clerk "inadvertently" plugged into the telephone conversation. Although conflicting evidence was presented regarding this factual issue, the district court's finding is supported by substantial evidence. We therefore will not disturb the finding on appeal. Morrison v. Rayen Investments, Inc., 97 Nev. 58, 61, 624 P.2d 11, 13 (1981). Because the motel was engaged in the business of providing telephone service and the desk clerk was operating the service when he inadvertently overheard part of Koza's conversation, we hold that the initial interception was not unlawful and, therefore, subject to disclosure at trial. The desk clerk's listening for one to two minutes thereafter was warranted by his reasonable apprehension that unlawful and life-threatening conduct was about to occur in his motel. See United States v. Axselle, 604 F.2d 1330 (10th Cir. 1979) (motel clerk listened for three to five minutes after inadvertently overhearing an "interesting comment"); U.S. v Savage, 564 F.2d 728 (5th Cir. 1977) (motel switchboard operator inadvertently overheard ten seconds of conversation); but see Watkins v. L.M. Berry & Company, 704 F.2d 577 (11th Cir. 1983) (disapproving Axselle). We therefore conclude that the desk clerk lawfully communicated what he had overheard to law enforcement personnel and that such communication constituted probable cause for Koza's arrest. Admission of the desk clerk's testimony concerning the conversation overheard while eavesdropping was an appropriate exercise of the trial court's discretion.

Koza's fourth contention is that the warrantless search of his motel room was not justified by the "emergency doctrine." In Banks v. State, 94 Nev. 90, 575 P.2d 592 (1978), we explained the ground for making a warrantless search and seizure.

> Law enforcement officers may enter private premises without either an arrest or a search warrant to preserve life or property, . . . provided they have reasonable grounds to believe that there is an urgent need for such assistance and protective action, or to promptly launch a criminal investigation involving a substantial threat of imminent danger to either [sic] life, health, or property, and provided, further, that they do not enter with an accompanying intent to either arrest or search. If, while on the premises, they

inadvertently discover incriminating evidence in plain view, or as a result of some activity on their part that bears a material relevance to the initial purpose for their entry, they may lawfully seize without warrant.

*Id.* at 97, 575 P.2d at 596, quoting E. Mascolo, *The Emergency Doctrine exception to the Warrant Requirement Under the Fourth Amendment,* 22 Buff.L.Rev. 419, 426-27 (1973). In the instant case, the officers were informed that an occupant in room 359 had been party to a conversation apparently planning an armed robbery and indicating that one of the callers was willing to kill in order to accomplish the robbery. The officers arrived at the motel thirty to forty-five minutes after the desk clerk's call, during which time a robbery could have occurred. Officer Schaub heard the sliding action of an automatic handgun after he knocked and announced that police wanted to question the occupants. Both Koza and his wife acted suspiciously and delayed exiting the room. Despite the telephone conversation mentioning a gun, the sliding action of a gun which the officer heard and the empty holster found clipped to Koza's belt, no gun was found on Koza or his wife. We agree with the district court's determination that under those circumstances the officers had reasonable grounds to believe that another accomplice might still be in the room and that an urgent need existed to preserve the life of a possible robbery victim or their own lives.

Koza next contends that the district court erred by denying his motion to suppress admission of the murder weapon, because the warrantless seizure of the partially visible gun from under the mattress was not justified by the "plain view doctrine." The U.S. Supreme Court's latest pronouncement on the plain view doctrine is set forth in Texas v. Brown, 103 S.Ct. 1535 (1983). The Court in *Brown* initially listed the three requirements, set forth in Coolidge v. New Hampshire, 403 U.S. 443 (1971), for a warrantless seizure.

> First, the police officer must lawfully make an "initial intrusion" or otherwise properly be in a position from which he can view a particular area. *Id.,* at 465-468, 91 S.Ct., at 2037-2039. Second, the officer must discover incriminating evidence "inadvertently," which is to say, he may not "know in advance the location of [certain] evidence and intend to seize it," relying on the plain view doctrine only as a pretext. *Id.,* at 470, 91 S.Ct., at 2040. Finally, it must be "immediately apparent" to the police that the items they observe may be evidence of a crime,

> contraband, or otherwise subject to seizure. *Id.,* at 466, 91 S.Ct., at 2038. While the lower courts generally have applied the *Coolidge* plurality's discussion of "plain view," it has never been expressly adopted by a majority of this Court.

103 S.Ct. at 1540. The Court then discussed each requirement as it related to the seizure in *Brown* of a balloon containing heroin from the front seat of a car. The seizure was upheld.

The first element is apparently satisfied in the instant case. According to our prior analysis, the officers made a lawful initial intrusion into the hotel room and a justified "protective sweep" of the room. During that sweep, an officer saw the chrome object. Moreover, with regard to this first element, the Court stated that in light of private Fourth Amendment interests and legitimate governmental interests, "our decisions have come to reflect the rule that if, while lawfully engaged in an activity in a particular place, police officers perceive a *suspicious object,* they may seize it immediately." *Id.* at 1541 (emphasis added).

The second element requires the officers to discover the evidence "inadvertently." The Court explained that the requirement of inadvertence means that the officers may not know in advance the location of the evidence and intend to seize it, relying on the plain view doctrine only as a pretext. Here, there is no suggestion that the entry into room 359 was merely a pretext to seize the gun. As in *Brown,* the officers in the instant case did not know in advance of their investigation the location of any incriminating evidence or any particular object they might seize.

The third element requires that it be "immediately apparent" to the officers that the object observed may be evidence of a crime, contraband, or otherwise subject to seizure. The Court explained that the phrase "immediately apparent" should not be interpreted too strictly.

> Decisions by this Court since *Coolidge* indicate that the use of the phrase "immediately apparent" was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the "plain view" doctrine.

*Id.* at 1542. The Court then explained that it does not "view the 'immediately apparent' language of *Coolidge* as establishing any requirement that a police officer 'know' that certain items are contraband or evidence of a crime." *Id.* The Court concluded by stating that probable cause to associate the object

with criminal activity creates a *presumption* that the warrantless seizure of evidence in plain view is reasonable.

> [T]he rule, set forth in *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), [is] that "[t]he seizure of property in plain view involves no invasion of privacy and *is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." Id.,* at 587, 100 S.Ct., at 1380 (emphasis added).

*Id.* The officer, after noticing the mattress was askew, spotted a piece of chrome metal under the mattress. Bending down, he could see a larger piece of it. Although he was not positive that the object was a gun, he testified that the object had the color of chrome of a gun. The officer was also aware that the occupants of the room may have planned an armed robbery, that he had heard the sliding action of an automatic handgun, that Koza was wearing an empty holster and that no gun had been found on Koza or his wife. These facts support the district court's finding that the officers had probable cause to associate the chrome object with criminal activity, even without their "knowing" that it was a gun. This result corresponds with the High Court's statement that an officer may immediately seize evidence that he perceives as a "suspicious object." All three of the elements of the plain view doctrine are satisfied here, making lawful the seizure of the gun partially hidden under the mattress. Admission of the gun at trial, therefore, was not error.

Koza's final contention is that the district court erred by imposing consecutive enhanced penalties. First, Koza argues that his robbery and murder convictions merge, such that imposition of separate, additional penalties for his robbery conviction violated the Double Jeopardy Clause. We have held, however, that robbery and felony murder are two separate and distinct offenses. Brimmage v. State, 93 Nev. 434, 443, 567 P.2d 54, 59-60 (1977). Each offense here, moreover, requires proof of an additional fact which the other does not. *Compare* NRS 200.010 and 200.380. The U.S. Supreme Court recently clarified its position with respect to cumulative punishment and the Double Jeopardy Clause in Missouri v. Hunter, 103 S.Ct. 673 (1983). "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Id.* at 678.

Where, as here, a legislature specifically authorizes

cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct . . . , a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

*Id.* at 679. Here, separate and distinct statutes and offenses are involved. We therefore conclude that Koza's sentencing did not violate the Double Jeopardy Clause.

We have considered Koza's remaining contentions and conclude that they are without merit. Accordingly, we affirm the convictions of first degree murder and robbery, both with the use of a deadly weapon, together with the consecutive sentences imposing two life sentences without the possibility of parole and two fifteen-year terms of imprisonment.