DURAND EUGENE BERRY, APPELLANT, v.
THE STATE OF NEVADA, RESPONDENT.

No. 49709

July 30, 2009                                    212 P.3d 1085

---

*Philip J. Kohn*, Public Defender, and *Lauren Diefenbach* and *Nancy Lemcke*, Deputy Public Defenders, Clark County, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *David J. Roger*, District Attorney, *Steven S. Owens*, Chief Deputy District Attorney, and *Ercan E. Iscan*, Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, HARDESTY, C.J.:

A jury convicted appellant Durand Eugene Berry of burglary while in possession of a deadly weapon, robbery with use of a deadly weapon, and one count of open and gross lewdness. In this opinion, we address three of the issues Berry raises on appeal and their accompanying subissues.

First, we consider Berry's challenges to the district court's jury instructions defining "deadly weapon" for purposes of the burglary-while-in-possession-of-a-deadly-weapon and robbery-with-use-of-a-deadly-weapon charges. Specifically, we discuss whether the district court erroneously instructed the jury on the meaning of "deadly weapon" by using NRS 202.265(5)(b)'s and NRS 202.253(2)'s definitions of "firearm." The instruction at issue provided, in pertinent part:

[A] deadly weapon includes:

1. Any device, whether loaded or unloaded, operable or inoperable, designed to be used as a weapon from which a projectile may be expelled through the barrel by the force of any explosion or other form of combustion; or

2. Any device, whether loaded or unloaded, operable or inoperable, from which a metallic projectile, including any ball bearing or pellet, may be expelled by means of spring, gas, air or other force.

We conclude that because NRS 202.265's list of weapons is specifically referenced in NRS 193.165(6)(c) as being deadly weapons, the district court did not err by instructing the jury on NRS 202.265(5)(b)'s definition of "firearm." We similarly hold that the district court did not err by instructing the jury on NRS 202.253(2)'s definition of "firearm," even though Berry was not charged with possession or use of a firearm and NRS 193.165(6) does not reference NRS 202.253. We are persuaded that a "firearm" under the general firearm definition of NRS 202.253(2) is an instrument designed to cause substantial bodily harm or death, and therefore, it falls within the meaning of "deadly weapon" under NRS 193.165(6)(a). As a result, we conclude that the district court did not err by using definitions from NRS 202.265(5)(b) and NRS 202.253(2) to define "deadly weapon."

Further, we discuss whether the law supports a jury instruction that a firearm is a deadly weapon despite it being unloaded or inoperable. Because NRS 202.265(5)(b) defines "firearm" as a device from which a metal projectile may be expelled by spring, air, gas, or other force, and NRS 202.253(2) defines "firearm" as a device from which a projectile may be expelled by explosion or combustion, we conclude that under both definitions, if the trier of fact finds that the weapon's capabilities are established by its design, not its operability, then the weapon meets the definition of a "deadly weapon." Thus, whether the weapon was unloaded or inoperable at the time of the crime is irrelevant.

In reaching this conclusion, we take the opportunity to clarify this court's holdings in *Allen v. State*, 96 Nev. 334, 609 P.2d 321 (1980), and *Anderson v. State*, 96 Nev. 633, 614 P.2d 540 (1980). While we stated in *Allen* that the purpose of the deadly weapon statute was to penalize an offender's use of a weapon not only because of the weapon's ability to inflict deadly harm but also because of the deadly reaction the weapon is likely to provoke, we note that the Legislature subsequently spoke on the issue by enacting NRS 193.165(6) to define what constitutes a "deadly weapon." Thus, although the rationale expressed in *Allen* is still part of this court's consideration, we conclude that a weapon must fall within NRS 193.165(6)'s definitions to uphold a finding that an instrument is a deadly weapon. And, contrary to *Anderson*'s implications, we reit-

erate that if the weapon is not a "firearm" under NRS 202.253(2), the State must prove that the weapon supporting the deadly weapon finding is a "deadly weapon" as defined in NRS 193.165(6).

Second, we consider whether sufficient evidence supports the deadly weapon findings for the charges of burglary while in possession of a deadly weapon and robbery with use of a deadly weapon. We conclude that based on the applicable statutory definitions of "deadly weapon," no rational trier of fact could have found beyond a reasonable doubt that the toy pellet gun used in this case was a deadly weapon.

Third, we consider Berry's challenges to his open and gross lewdness conviction. In particular, we consider whether the open and gross lewdness statute, NRS 201.210, is unconstitutionally vague and whether the district court erred by instructing the jury on definitions of "gross" and "lewdness" that were not prescribed by Nevada law. We conclude that the terms "gross" and "lewdness," although not statutorily defined, are common words with generally accepted meanings. Thus, we hold that NRS 201.210 is not unconstitutionally vague because an average person of ordinary intelligence can determine what conduct is proscribed by the statute. We further conclude that based on the common law definition of "open lewdness," and the plain, ordinary meaning of NRS 201.210's terms, Berry failed to demonstrate that any error in the district court's instruction amounted to plain error affecting his substantial rights.

## FACTS AND PROCEDURAL BACKGROUND

On February 26, 2006, the victim, Armstrong, was working by herself at Koster's Cash Loans, a payday loan store. At the end of her shift, Armstrong began to close the store by counting the money that the business had received that day and placing it in the store's safe. As she prepared to leave for the evening, she went outside to start her car, intending to return to the store only to retrieve her personal belongings and lock the doors. On her way back into the store, Berry approached her, held a gun (later determined to be a "Speedy Toys" pellet gun) to her neck, and told her to go into the store and give him all the money.

Berry and Armstrong went into the store and into the closet where the store's safe was kept. Armstrong explained to Berry that it was a time-delay safe and, therefore, he would have to wait ten minutes before it would open. Armstrong testified that Berry told her that he would not shoot her as long as she was not lying and that he would wait for the safe to open.

Armstrong testified that while they were waiting for the safe to open, Berry began touching her on her "behind area and [her] hips and [her] back and shoulders." She testified that Berry said she had a nice body and that if he had known about the time-delay safe taking ten minutes he would have "had his fun with [her]." She

thought that he meant he would try to have sex with her. Armstrong described the touching as Berry standing behind her and holding her near him. She testified that he was rubbing his genitals against her for the entire ten minutes that they waited for the safe to open. At one point, Berry also massaged her shoulders and told her to relax.

When the safe's ten-minute time delay had elapsed, Armstrong opened the safe. Berry ordered her to kneel in the corner of the closet, facing away from him. Berry took everything out of the safe, placed it in a backpack, and ordered Armstrong to stay in the closet for one minute after he left, threatening that someone would shoot her otherwise. Armstrong, who had her cellular telephone in her jacket pocket, called 911 from the closet.

Police officers had already been dispatched to the store based on an anonymous 911 call. Upon arrival, an officer saw Berry exit the closet door and pull a mask over his face. As Berry exited the store, the officer identified himself to Berry and, with his gun pointed at Berry, demanded that he stop. Berry ran from the officer, jumped over some shrubs, and climbed a wall into a nearby apartment-style retirement community. The officer found Berry hiding behind a washing machine on a patio.

Berry dropped his backpack while fleeing. Inside the backpack, the crime scene analyst found a toy pellet gun, the contents of the safe, an identification card, a bandana, and a hammer.

On February 28, 2006, the State charged Berry with burglary while in possession of a deadly weapon, robbery with use of a deadly weapon, first-degree kidnapping with use of a deadly weapon, and two counts of open and gross lewdness. Berry pleaded not guilty and the matter proceeded to trial. At trial, the State offered Detective Lance Spiotto as the single witness to testify as to the appearance and capabilities of the gun that Berry used during the crime. Detective Spiotto testified that it was a type of pellet gun with a plastic body and a spring action magazine, designed to look like a Beretta 9-millimeter handgun. The gun, manufactured by Speedy Toys, was available for purchase online for approximately $20. Detective Spiotto further testified that the gun would be capable of firing a projectile because normally a gun of its type was "operated by a sealed-to-cartridge spring mechanism." When asked whether it could fire a bullet, he answered, "Definitely not a .45, but I guess if you made one small enough, you can—I don't know what a .22 would do in there." To his knowledge, no one had tried to fire the gun when it was seized, and no pellets were found in Berry's possession. Additionally, the crime scene analyst testified that when impounding the evidence she labeled the gun a toy but that it appeared capable of firing a projectile. The gun was also admitted into evidence for the jury to examine.

At the conclusion of trial, the district court instructed the jury that a deadly weapon included: any device that constitutes a "firearm"

pursuant to NRS 202.253(2) or NRS 202.265(5)(b), regardless of whether the gun was unloaded or inoperable; any instrument that was inherently dangerous, under NRS 193.165(6)(a); or any instrument or device that is readily capable of causing substantial bodily harm or death, pursuant to NRS 193.165(6)(b). The jury returned a verdict finding Berry guilty of burglary while in possession of a deadly weapon, robbery with use of a deadly weapon, and one count of open and gross lewdness. After the district court denied Berry's motion to set aside his convictions, Berry appealed.

## DISCUSSION

On appeal, we discuss three of Berry's challenges and their accompanying subissues. First, we consider the district court's use of NRS 202.265(5)(b)'s and NRS 202.253(2)'s "firearm" definitions, and its use of unloaded or inoperable language to define "deadly weapon" for the burglary-while-in-possession-of-a-deadly-weapon and robbery-with-use-of-a-deadly-weapon charges. Second, we consider whether sufficient evidence supports the jury's determination that the pellet gun possessed and used in the crimes was a deadly weapon. Third, we discuss Berry's challenges to the constitutionality of the open and gross lewdness statute and the district court's instructions on definitions of "gross" and "lewdness." We address each of these arguments in turn.

### Jury instruction defining "deadly weapon"

Berry's challenge to the deadly weapon jury instruction is twofold. First, Berry argues that the district court erred by instructing the jury on definitions of "firearm" derived from NRS 202.265(5)(b) and NRS 202.253(2). He claims that those definitions are not applicable to his case, alleging that NRS 202.265(5)(b) is limited to weapons possessed on school grounds and that NRS 202.253(2) is not referenced in NRS 193.165(6)(c) as an applicable statutory definition. Second, Berry argues that the law does not support the district court's instruction that a firearm under NRS 202.265(5)(b) and NRS 202.253(2) is a deadly weapon regardless of whether it was unloaded or inoperable. After considering the statutes at issue, we reject Berry's assignments of error.

#### Standard of review

This court generally reviews a district court's decision settling jury instructions for an abuse of discretion or judicial error. *Brooks v. State*, 124 Nev. 203, 206, 180 P.3d 657, 658-59 (2008). However, whether the jury instruction was an accurate statement of the law is a legal question subject to de novo review. *Nay v. State*, 123 Nev. 326, 330, 167 P.3d 430, 433 (2007). Because Berry argues that the

district court's deadly weapon instruction was a misstatement of law, we review the legal accuracy of the court's instructions de novo. *See id.*

### Definitions of "firearm"

NRS 193.165 provides an additional penalty for offenders who use a deadly weapon during the commission of a crime. NRS 193.165(6) provides various definitions of "deadly weapon" to enhance an offender's sentences for robbery with use of a deadly weapon. Those definitions are also relevant in determining whether a person had possession or gained possession of a deadly weapon during a burglary for purposes of the aggravated sentencing range provided in NRS 205.060(4). *Funderburk v. State*, 125 Nev. 260, 212 P.3d 337 (2009). NRS 193.165(6)(a) through (b) defines "deadly weapon" as an instrument that is used in the manner in which it was designed to cause substantial bodily harm or death or, under the circumstances in which it was used, is likely to cause substantial bodily harm or death. NRS 193.165(6)(c) further defines "deadly weapon" to include "[a] dangerous or deadly weapon specifically described in NRS 202.255, 202.265, 202.290, 202.320 or 202.350."[1] Therefore, NRS 193.165(6)(c) expressly incorporates the definitions set forth in those particular statutes.

The five statutes referenced in NRS 193.165(6)(c) each pertain to crimes involving weapons. One of the referenced statutes, NRS 202.265, which is entitled, in part, "[p]ossession of dangerous weapon on property or in vehicle of school or child care facility," makes possession of certain weapons on school grounds a gross misdemeanor. NRS 202.265(1)(e) prohibits, for example, possession of "[a] pistol, revolver or other firearm." NRS 202.265(5)(b) defines the term "firearm," "[f]or the purposes of [that] section," as "any device from which a metallic projectile, including any ball bearing or pellet, may be expelled by means of spring, gas, air or other force."

The district court in this case used NRS 202.265(5)(b)'s definition of "firearm" in the deadly weapon instruction. In total, the court

---

[1]NRS 193.165(6) reads, in its entirety:

As used in this section, "deadly weapon" means:

(a) Any instrument which, if used in the ordinary manner contemplated by its design and construction, will or is likely to cause substantial bodily harm or death;

(b) Any weapon, device, instrument, material or substance which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing substantial bodily harm or death; or

(c) A dangerous or deadly weapon specifically described in NRS 202.255, 202.265, 202.290, 202.320 or 202.350.

used definitions from NRS 193.165(6)(a), NRS 193.165(6)(b), NRS 202.265(5)(b), and NRS 202.253(2).[2]

First, Berry challenges the district court's use of the latter two statutes, arguing that the instruction on firearm definitions was erroneous because he was not charged with possession or use of a firearm. Rather, he was charged with possession and use of a deadly weapon. However, because the term "deadly weapon" is broad, and firearms are included within the meaning of that term, we disagree with Berry's argument.

NRS 202.265(5)(b) and NRS 202.253(2) define "firearm," and both definitions are included within NRS 193.165(6)'s definitions of "deadly weapon." In particular, NRS 202.265(5)(b) (defining the term "firearm" as "any device from which a metallic projectile, including any ball bearing or pellet, may be expelled by means of spring, gas, air or other force") is specifically referenced in NRS 193.165(6)(c). *See* NRS 193.165(6)(c) (providing that " 'deadly weapon' means: . . . (c) [a] dangerous or deadly weapon specifically described in . . . NRS 202.265 . . ."). Therefore, for enhancement purposes, a firearm under NRS 202.265(5)(b) is a deadly weapon.

Further, NRS 202.253(2)'s definition of "firearm" also amounts to a deadly weapon under NRS 193.165(6) because, under NRS 202.253(2), a firearm is "any device designed to be used as a weapon from which a projectile may be expelled through the barrel by the force of any explosion or other form of combustion." Naturally, a device that is constructed to be a weapon and is designed to expel projectiles falls within the purview of NRS 193.165(6)(a)'s definition of "deadly weapon" because it is designed to cause substantial bodily harm or death. In conclusion, because both of the "firearm" definitions that the district court used to instruct the jury are encompassed within NRS 193.165(6)'s definitions of "deadly weapon," we conclude that the district court did not err.

Moreover, Berry asserts that these definitions are inapplicable to this case because (1) NRS 202.265 is limited to weapons possessed on school grounds, and (2) NRS 202.253 is not one of the statutes referenced by NRS 193.165(6). We reject Berry's arguments.

With respect to Berry's challenge to the district court's use of NRS 202.265, we are convinced that the limitation expressed in

---

[2]NRS 202.253 provides, in pertinent part: "As used in NRS 202.253 to 202.369, inclusive: . . . 2. '[f]irearm' means any device designed to be used as a weapon from which a projectile may be expelled through the barrel by the force of any explosion or other form of combustion."

NRS 202.265(5) applies only to the crime it creates and does not limit its use as a definition of a "deadly weapon." Moreover, in *Funderburk v. State*, we established that NRS 193.165(6) includes in its definitions any weapon described in the statutes listed in paragraph (c). 125 Nev. 260, 212 P.3d 337 (2009). As a result, we reiterate our conclusion from *Funderburk* and hold that any weapon that meets the description set forth in NRS 202.265(5)(b) supports a deadly weapon finding. Accordingly, we conclude that the district court did not err by instructing the jury using language from NRS 202.265(5)(b)'s definition of "firearm."

Turning to Berry's challenge to the district court's instruction using NRS 202.253(2)'s definition of "firearm," we conclude that the district court did not err. As explained above, NRS 193.165(6)(a)'s definition of "deadly weapon" encompasses "firearm" under NRS 202.253(2)'s definition, as a firearm is a device that is designed to cause substantial bodily harm or death. In addition, NRS 202.253(2) is the general "firearm" definition for purposes of NRS 202.253 through 202.369. Thus, as a general definition, NRS 202.253 applies to every other statute referred to by NRS 193.165(6)(c) that employs the term "firearm." *See* NRS 193.165(6)(c) (referencing NRS 202.255, 202.265, 202.290, 202.320, and 202.350). Because the general "firearm" definition of NRS 202.253(2) applies to all of the statutes referenced in NRS 193.165(6)(c), we conclude that NRS 202.253 is incorporated into the statutes that NRS 193.165(6)(c) references and, therefore, that definition is applicable to define a "deadly weapon."

In sum, we conclude that the district court did not err by using the "firearm" definitions from NRS 202.265(5)(b) and NRS 202.253(2) to define "deadly weapon" for Berry's burglary-while-in-possession-of-a-deadly-weapon and robbery-with-use-of-a-deadly-weapon charges.

*Propriety of the unloaded or inoperable language*

Second, Berry argues that the district court erred by instructing the jury that a firearm under NRS 202.265(5)(b) and NRS 202.253(2) was a deadly weapon regardless of whether it was unloaded or inoperable. We disagree and conclude that this instruction is a correct statement of law.

NRS 202.265(5)(b)'s and NRS 202.253(2)'s definitions of "firearm" both include devices that are designed to be capable of expelling projectiles, one by means of spring, gas, air, or other force and the other by explosion or combustion. Under these definitions, if the fact-finder determines that by its design—for example, because it is constructed with a spring, gas, air, or explosion mechanism, the weapon is capable of expelling projectiles (specifically metallic pro-

jectiles under NRS 202.265(5)(b))—the definitions are met. Whether the weapon was unloaded or inoperable is therefore irrelevant. Hence, we conclude that the district court did not err.

Although we conclude that the district court's unloaded or inoperable instruction was not erroneous as a matter of law, we take this opportunity to clarify our holdings in *Allen v. State*, 96 Nev. 334, 609 P.2d 321 (1980), and *Anderson v. State*, 96 Nev. 633, 614 P.2d 540 (1980). In *Allen*, this court addressed whether an inoperable firearm was a deadly weapon under NRS 193.165. 96 Nev. at 336, 609 P.2d at 322. In holding that an inoperable firearm used in the commission of a crime could support a deadly weapon enhancement, this court reasoned, "[a] firearm is dangerous, not only because it can inflict deadly harm, but because its use may provoke a deadly reaction from the victim or from bystanders." *Id*. Then, in *Anderson*, this court expanded its holding in *Allen* to apply to the use of a blank gun. 96 Nev. at 634, 614 P.2d at 540. Without describing the type of gun or its capabilities, the *Anderson* court summarily stated that it "perceive[d] no substantial distinction between the inoperable firearm in *Allen* and the blank gun used in the instant case." *Id*. Here, the State relies on *Allen* and *Anderson*, maintaining that a pellet gun is per se a deadly weapon because there is no difference between the pellet gun used in this case and the guns used in *Allen* and *Anderson*.

■■■■■■ ■■ ■■

Although the *Allen* court considered the fear or deadly reaction that may be provoked by the use of a weapon, we now clarify that whether the weapon was capable of producing reasonable fear is an ancillary consideration when determining whether a weapon is a "deadly weapon." Because the Legislature drafted specific provisions defining "deadly weapon" after this court decided *Allen* and *Anderson*, *see* 1995 Nev. Stat., ch. 455, § 1, at 1431, the statutory definitions set forth in NRS 193.165(6) control and the State must prove that the weapon is a "deadly weapon" pursuant to NRS 193.165(6). Thus, to the extent that *Allen* or *Anderson* imply that a weapon need not meet one of NRS 193.165(6)'s "deadly weapon" definitions, we take this opportunity to clarify that it does.

*Sufficiency of the evidence supporting the finding of a deadly weapon*

■■■■■■ ■■

Berry argues that even if the district court properly instructed the jury, there was insufficient evidence to support a finding that the toy pellet gun was a deadly weapon. Specifically, Berry claims that the State failed to establish either that the Speedy Toys pellet gun could fire a projectile by the force of an explosion or combustion, *see* NRS 202.253(2), or that it was capable of firing a metal projectile. *See* NRS 202.265(5)(b). We agree and conclude that this failure warrants reversal of the aggravated sentence for burglary while in possession

of a deadly weapon and the deadly weapon enhancement sentence for the robbery conviction.

In reviewing the sufficiency of the evidence supporting a jury verdict in a criminal case, this court views the evidence in the light most favorable to the verdict and determines whether " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Mitchell v. State*, 124 Nev. 807, 816, 192 P.3d 721, 727 (2008) (quoting *Koza v. State*, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984)).

In this case, as previously discussed, in order to meet its burden of proof, the State had to establish that the pellet gun Berry possessed during, and used in, the commission of the crimes was indeed a "deadly weapon" under NRS 193.165. According to the applicable statutes, the pellet gun would have been a deadly weapon if it was (1) designed to cause substantial bodily harm or death, NRS 193.165(6)(a); (2) used in a manner which, under the circumstances, could cause substantial bodily harm or death pursuant to NRS 193.165(6)(b); (3) capable of expelling a metal projectile by use of spring, gas, air, or other force pursuant to NRS 202.265(5)(b); or (4) designed to expel a projectile by the force of an explosion pursuant to NRS 202.253(2). The record does not reveal any evidence presented by the State that suggests that the pellet gun at issue was specifically designed to cause substantial bodily harm or death, *see* NRS 193.165(6)(a), that Berry used the pellet gun in a manner that could cause substantial bodily harm or death, *see* NRS 193.165(6)(b), or that the gun was designed to expel a projectile by the force of an explosion. *See* NRS 202.253(2).

Instead, the record reflects that the State attempted to prove that the gun was a deadly weapon under NRS 202.265(5)(b) by presenting evidence that the gun was capable of firing metal projectiles. But the only evidence offered at trial consisted of testimony regarding the type of projectile that this gun was capable of firing, which came from Detective Spiotto. Detective Spiotto's testimony that the pellet gun would be capable of firing a projectile was based on the fact that "[n]ormally" a gun of its type was "operated by a sealed-to-cartridge spring mechanism." He also explained that a pellet for the gun is usually plastic but could be metal. Notably, when specifically asked whether the gun could fire a bullet, he answered, "Definitely not a .45, but I guess if you made one small enough, you can—I don't know what a .22 would do in there." According to Detective Spiotto, no one had tried to fire the gun and no projectiles of any kind were found in Berry's possession upon arrest. Based on the uncertainty of this testimony, we determine that no rational trier of

fact could have found beyond a reasonable doubt that the gun was capable of firing metal projectiles.[3]

Therefore, because Detective Spiotto's testimony did not prove beyond a reasonable doubt that this weapon was within NRS 202.265(5)(b)'s definition of "firearm" or any other definition of "deadly weapon," we conclude that the State's evidence was insufficient to support Berry's deadly weapon enhancements.

## Open or gross lewdness conviction

Berry also challenges his open and gross lewdness conviction for two reasons. First, Berry argues that NRS 201.210 is unconstitutionally vague because the terms "gross" and "lewdness" lack definite meaning. Second, Berry argues that the district court erred by instructing the jury on definitions of "gross" and "lewdness" that were not prescribed by Nevada law. We conclude that because "gross" and "lewdness" are terms that convey to the average person what conduct is proscribed, NRS 201.210 is not unconstitutionally vague and any error made by the district court with respect to the open and gross lewdness instruction did not amount to plain error affecting Berry's substantial rights.

### Constitutionality of NRS 201.210

This court reviews a challenge to the constitutionality of a statute de novo. *Silvar v. Dist. Ct.*, 122 Nev. 289, 292, 129 P.3d 682, 684 (2006). Because the court presumes that statutes are constitutional, a party challenging the statute has the burden of making "a clear showing of invalidity." *Id.*

A statute is void for vagueness, and therefore facially unconstitutional, "if the statute both: (1) fails to provide notice sufficient to enable ordinary people to understand what conduct is prohibited; and (2) authorizes or encourages arbitrary and discriminatory enforcement." *City of Las Vegas v. Dist. Ct.*, 118 Nev. 859, 862, 59 P.3d 477, 480 (2002). However, a statute will be deemed

---

[3]In response to questioning by this court at oral argument concerning the uncertain nature of Detective Spiotto's testimony, the State argued that the jury had the opportunity to examine the gun and its conclusion that the gun was a deadly weapon must be afforded deference. We reject this argument because, although he was not an expert, Detective Spiotto was experienced with guns and he was unable to determine whether the pellet gun used in this case could, beyond a reasonable doubt, fire a metal projectile. Thus, we conclude that no rational trier of fact could find that the pellet gun used in this case was indeed capable of firing a metal projectile.

to give sufficient notice of proscribed conduct when, viewing the context of the entire statute, the words used have a well-settled and ordinarily understood meaning. *Nelson v. State*, 123 Nev. 534, 540-41, 170 P.3d 517, 522 (2007). It has also been established that when an offense has not been defined by the Legislature, we generally look to the common law definitions of the related term or offense. *Ranson v. State*, 99 Nev. 766, 767, 670 P.2d 574, 575 (1983).

In this case, the challenged statute provides: "A person who commits any act of open or gross lewdness is guilty: (a) [f]or the first offense, of a gross misdemeanor [and] (b) [f]or any subsequent offense, of a category D felony and shall be punished as provided in NRS 193.130." NRS 201.210(1). At common law, "open lewdness was defined as an 'unlawful indulgence of lust involving gross indecency with respect to sexual conduct' committed in a public place and observed by persons lawfully present." *Young v. State*, 109 Nev. 205, 215, 849 P.2d 336, 343 (1993) (quoting 3 *Wharton's Criminal Law* § 315 (14th ed. 1980)). Thus, the definition of "open lewdness" at common law expressed elements concerning acts that were sexual in nature, public, and observed by others. *See id.*

### "Open"

This court has previously considered what acts of lewdness were deemed "open" under NRS 201.210. *Ranson*, 99 Nev. 766, 670 P.2d 575; *Young*, 109 Nev. 205, 849 P.2d 336. The *Ranson* court concluded that because the term "open" modified the word "lewdness," the Legislature "intend[ed] to broaden the common law definition to include acts which are committed in a private place, but which are nevertheless committed in an 'open' as opposed to a 'secret' manner." 99 Nev. at 767, 670 P.2d at 575. Thus, the court held that even if an act is not committed in a public place, when the evidence shows that an offender clearly intended his acts to be offensive to his victim, he acted in an "open" fashion and is, therefore, guilty of open lewdness under NRS 201.210. *Id.* at 768, 670 P.2d at 575.

We then expanded our interpretation of "open lewdness" in *Young*, when we expressed that NRS 201.210 "does not require proof of intent to offend an observer or even that the exposure was observed." 109 Nev. at 215, 849 P.2d at 343. Instead, the court explained, "[i]t is sufficient that the public sexual conduct or exposure was intentional." *Id.* Therefore, as the law stands with respect to the meaning of "open" for purposes of NRS 201.210, we determine that the term is not vague. Under *Ranson* and *Young*, the fact that an act is committed openly is sufficient for the fact-finder to conclude that there was a likelihood that the act would be observed and that

it would be offensive to observers. Accordingly, we conclude that the term ''open'' is not vague.

### *''Gross lewdness''*

In addition, we conclude that the phrase ''gross lewdness'' in NRS 201.210 is neither vague nor indefinite; rather, we are persuaded that it has a well-defined, well-understood, and generally accepted meaning, sufficient to inform an offender of the act that is prohibited. The term ''gross,'' as used in NRS 201.210, modifies the term ''lewdness.'' This placement of the term ''gross'' narrows the meaning and breadth of ''lewdness'' by specifying the degree of ''lewdness'' required by the statute. *Merriam-Webster's Collegiate Dictionary* defines ''gross'' to mean ''immediately obvious . . . glaringly noticeable usu[ally] because of inexcusable badness or objectionableness.'' 551 (11th ed. 2003). Therefore, for purposes of NRS 201.210, the statute prohibits lewd acts that are ''glaringly noticeable'' or obviously objectionable. *See id.* In light of the plain meaning of the word ''gross'' and its placement with respect to the term ''lewdness,'' we conclude that, as used in NRS 201.210, ''gross'' sufficiently informs people what degree of lewdness is prohibited.[4]

With respect to the term ''lewdness,'' this court has previously considered a vagueness challenge to that word in *Summers v. Sheriff*, 90 Nev. 180, 521 P.2d 1228 (1974). In *Summers*, this court established that the word ''lewd,'' under NRS 201.230, defining ''lewdness with a minor,'' was not exceedingly vague to render the statute void, stating, ''[w]hile 'lewd' is not specifically defined in our statutes, the word 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.' '' *Id.* at 182, 521 P.2d at 1228 (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)). Even though the analysis in *Summers* concerned lewdness with a minor under NRS 201.230, and that analysis was brief, we are convinced that dictionary definitions and other jurisdictions' reasoning regarding similar lewdness statutes support the same conclusion here.

Modern authorities define ''lewd'' as pertaining to sexual conduct that is ''[o]bscene or indecent; tending to moral impurity or wantonness,'' *Black's Law Dictionary* 927 (8th ed. 2004), ''evil, wicked'' or ''sexually unchaste or licentious,'' *Merriam-Webster's Collegiate Dictionary* 715 (11th ed. 2003), and ''[p]reoccupied with sex and sexual desire; lustful,'' *The American Heritage Dictionary of*

---

[4]Other courts have also rejected vagueness challenges to the term ''gross,'' reasoning that it has an ordinary meaning: ''glaringly noticeable,'' ''glaringly obvious,'' or ''flagrant.'' *See, e.g., Maun v. Dept. of Professional Regulation*, 701 N.E.2d 791, 798-99 (Ill. App. Ct. 1998); *State v. Welch*, 707 N.E.2d 1133, 1135 (Ohio Ct. App. 1997); *Chandler v. Housholder*, 722 S.W.2d 217, 218 (Tex. App. 1987).

*the English Language* 1035 (3d ed. 1996).[5] Other jurisdictions considering vagueness challenges to statutes worded similar to NRS 201.210 have upheld those statutes reasoning that the terms "lewd" or "lewdness" have "generally accepted meanings," *State v. Cook*, 678 P.2d 987, 989 (Ariz. Ct. App. 1984), and "the concept of lewdness is sufficiently a matter of common knowledge that the average citizen can determine what conduct is proscribed." *Profit v. City of Tulsa*, 574 P.2d 1053, 1056 (Okla. Crim. App. 1978). Therefore, we determine that "lewdness" has a sufficiently definite meaning such that the average person would know what kinds of acts are prohibited by NRS 201.210.[6] Because the terms "open," "gross," and "lewdness" all have well-defined and well-understood meanings, we hold that NRS 201.210 is not unconstitutionally vague.

### *Jury instructions defining "gross" and "lewdness"*

As previously mentioned, whether a jury instruction was an accurate statement of the law is a legal question subject to de novo review. *Nay v. State*, 123 Nev. 326, 330, 167 P.3d 430, 433 (2007). But, when a criminal defendant fails to object to a district court's

---

[5]Several jurisdictions have likewise concluded that the term "lewd" or "lewdness" have commonplace meanings. *See, e.g.*, *State v. Gates*, 897 P.2d 1345, 1348 (Ariz. Ct. App. 1994) ("Although the term 'lewd' is not defined by statute or Arizona case law, it has been held to have an ordinary meaning, one that is 'easily understood by the common man.'" (quoting *State v. Limpus*, 625 P.2d 960, 965 (Ariz. Ct. App. 1981)); *George v. State*, 189 S.W.3d 28, 34 (Ark. 2004) ("'Though "lewd" is not defined in the Arkansas Code, the court of appeals has stated that "lewd" is a common word with an ordinary meaning [and] *Black's Law Dictionary* defines "lewd" as "[o]bscene or indecent; tending to moral impurity or wantonness."'" (second alteration in original) (citations omitted) (quoting *Cummings v. State*, 110 S.W.3d 272, 278 (Ark. 2003))); *People v. Pinkoski*, 752 N.Y.S.2d 421, 424 (App. Div. 2002) ("[T]he word [lewd] is not so arcane as to escape the understanding of the average juror."); *State v. Hammett*, 642 S.E.2d 454, 458 (N.C. Ct. App. 2007) ("This Court has defined the words 'lewd' and 'lascivious' according to their plain meaning in ordinary usage."); *Tovar v. State*, 165 S.W.3d 785, 790 (Tex. App. 2005) ("'Lewd' is not defined by the penal code . . . [but] because 'lewd' has a common meaning that jurors can be fairly presumed to know and apply, the trial court was not required to define 'lewd' in the jury charge."); *State v. Lubotsky*, 434 N.W.2d 859, 861 (Wis. Ct. App. 1988) (concluding that dictionary "definitions reflect the ordinary and accepted meaning of the word 'lewd.'" (citations omitted)).

[6]Additional jurisdictions have upheld their lewdness statutes after considering vagueness challenges. *See, e.g.*, *State v. B Bar Enterprises, Inc.*, 649 P.2d 978, 982 (Ariz. 1982) ("[L]ewdness as used in A.R.S. § 12-802 [the statute prohibiting the use of buildings 'for the purpose of lewdness'] is not unconstitutionally vague."); *State v. Holstead*, 354 So. 2d 493, 497 (La. 1977) ("'The word[ ] "lewd" . . . [is] not vague and indefinite. On the contrary, [it] ha[s] a well defined, well understood, and generally accepted meaning . . . . The word "lewd" means lustful, indecent, lascivious, and signifies that form of immorality which has relation to sexual impurity . . . .'" (quoting *State v. Prejean*, 45 So. 2d 627, 629 (La. 1950))); *State v. Club Recreation and Pleasure*, 599

action, this court reviews the record for plain error only. *Nelson v. State*, 123 Nev. 534, 543, 170 P.3d 517, 524 (2007). " 'To be plain, an error must be so unmistakable that it is apparent from a casual inspection of the record' " and the defendant must demonstrate that the error affected his substantial rights. *Id.* (quoting *Garner v. State*, 116 Nev. 770, 783, 6 P.3d 1013, 1022 (2000), *overruled on other grounds by Sharma v. State*, 118 Nev. 648, 56 P.3d 868 (2002), *and by Nika v. State*, 124 Nev. 1272, 198 P.3d 839 (2008)).

In this case, Berry failed to object to the district court's jury instructions concerning his open and gross lewdness charges. Therefore, we review the adequacy of the district court's instructions for plain error.

The district court instructed the jury on Berry's open and gross lewdness charges as follows:

> With reference to the crime of Open and Gross Lewdness, you are instructed that the word "open" is used to modify the term "lewdness[.]" As such, it includes acts which are committed in a private place, but which are nevertheless committed in an "open" as opposed to a "secret" manner. You are further instructed that it includes an act done in an "open" fashion clearly intending that the act be offensive to the victim.
>
> The term "gross" is defined as being indecent, obscene or vulgar.
>
> The term "lewdness" is defined as any act of a sexual nature which the actor knows is likely to be observed by the victim who would be affronted by the act.

Berry concedes that the district court's instruction on the word "open" is in conformity with this court's decisions in *Ranson*, 99 Nev. 766, 670 P.2d 574, and *Young*, 109 Nev. 205, 849 P.2d 336. And, after considering the common law definition of "open lewdness" and the ordinary meanings of the terms "gross" and "lewdness," we conclude that the trier of fact could have found that Berry's touching of Armstrong was sexual in nature, committed in an open fashion, and could have been observed by others who would have been offended. Accordingly, we conclude that Berry has failed to demonstrate that any error in the jury instruction affected his substantial rights.

---

P.2d 1194, 1200 (Or. Ct. App. 1979) ("Lewdness is defined as 'gross indecency so notorious as to tend to corrupt the community's morals.' . . . We find th[is] term[ ] [is] not unconstitutionally vague." (quoting *Black's Law Dictionary* 1052 (rev. 4th ed. 1968))); *State v. Carter*, 687 S.W.2d 292, 293-94 (Tenn. Crim. App. 1984) ("The constitutionality of the statute . . . is not vague. . . . [T]he words in the statute, lewd, lascivious, and obscene, are sufficient descriptions to put ordinary men of common intelligence on notice as to what conduct is prohibited.").

## CONCLUSION

We conclude that, for purposes of Berry's burglary-while-in-possession-of-a-deadly-weapon and robbery-with-use-of-a-deadly-weapon charges, the district court did not err by using NRS 202.265(5)(b)'s and NRS 202.253(2)'s definitions of "firearm" to instruct the jury on the meaning of "deadly weapon." In particular, NRS 193.165(6)(c) specifically refers to weapons defined under NRS 202.265 as deadly weapons and, under NRS 193.165(6)(a), a "firearm" as defined under NRS 202.253(2) is also a "deadly weapon." Further, after reexamining this court's holdings in *Allen* and *Anderson*, we overrule those cases to the extent that they suggest that a weapon that is likely to produce fear or a deadly reaction is a deadly weapon. Rather, a weapon must meet one of the definitions set forth in NRS 193.165(6) to qualify as a deadly weapon for enhancement purposes.

However, regarding Berry's deadly weapon convictions, we conclude that the State failed to present sufficient evidence to support a finding of a deadly weapon under NRS 193.165(6). While Detective Spiotto testified that pellet guns are designed to fire projectiles (normally due to the sealed-to-cartridge spring mechanism) and that the gun in this case could possibly fire a metal projectile, the State failed to demonstrate beyond a reasonable doubt that the weapon was designed to be capable of firing a metal projectile, as required under NRS 202.265(5)(b).

Finally, we conclude that NRS 201.210, the open and gross lewdness statute, is not unconstitutionally vague. Each of the terms set forth in the statute—"open," "gross," and "lewdness"—all have generally accepted meanings that impart sufficient notice on the average person of what conduct the statute proscribes. And, considering the common law definition of "open lewdness" and the ordinary meanings of NRS 201.210's terms, we are persuaded that the jury could have convicted Berry under NRS 201.210. Thus, any error made by the district court in giving the instruction does not rise to plain error.

Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.[7]

PARRAGUIRRE, DOUGLAS, CHERRY, SAITTA, GIBBONS, and PICKERING, JJ., concur.

---

[7]In addition to the specific challenges addressed in this opinion, Berry also raises separate challenges relating to the admission of Detective Spiotto's testimony, the admission of false identifications that were located in Berry's backpack upon arrest, and the district court's failure to admit evidence of Berry's statement to police. Additionally, Berry raises challenges concerning various instances of prosecutorial misconduct, sufficiency of the evidence supporting his open and gross lewdness conviction, and cumulative error. After careful review, we conclude that none of these challenges warrant reversal.