*1488
 
 OPINION
 

 Per Curiam:
 

 FACTS
 

 On December 14, 1991, William and Gwen Milton were found murdered in their Sparks home. Gwen Milton’s body was found in the upstairs master bedroom and William Milton’s body was found in William’s upstairs office. Gwen, age 62, had been stabbed 21 times. She was still wearing her coat, and her purse was near her body, even though, it was her habit to remove her
 
 *1489
 
 coat and purse near the front door upon entering. William, age 63, had been stabbed 16 times. He also suffered blunt force trauma to the head and had defensive wounds on his hands. The facts supported the conclusion that the murders occurred sometime in the afternoon on Friday, December 13, 1991.
 

 Gwen’s purse had no cash in it, even though her custom was to carry cash; the jewelry she was wearing remained on her body. The bedroom where she was found was otherwise untouched. The main level of the house was also undisturbed.
 

 The Miltons kept a spare house key hidden behind a freezer in the garage. The location of the key was known to family members, including the victims’ son, appellant Gregory Milton, who did not have his own key to the house. The spare key was missing when Kathy Lisetor, the victims’ daughter, went to the family home in search of her parents on December 14, 1991. There were no signs of forced entry into the house.
 

 The amount of $1,194 was missing from a coin counter that William used in the course of his work as an employee of Pure Systems, Inc., a water vending machine company. Also, in the upstairs guest bedroom a large wine bottle which had contained a substantial number of quarters had been broken and the coins were missing. The bottle was usually stored in William’s bedroom on the first floor of the house. Nothing else was disturbed in either William’s bedroom or the guest bedroom. William’s wallet and empty money clip were found near his body; the wallet contained loose papers and credit cards, but no money. Testimony revealed that William always carried cash in his money clip and wallet. No valuables in the house were disturbed except for cash on the victims and the coins in the wine bottle and the coin counter. There were no signs that the house had been ransacked in search of valuables or cash.
 

 In William’s office there was a two-drawer metal file cabinet where credit card receipts were stored. The drawers were open and there was a blood smear on the top handle. On the top of the cabinet, the police found a cork which fit the broken wine bottle that had contained the coins. Also on the cabinet were William’s money clip and the remains of an unfiltered cigarette. Both victims smoked filtered cigarettes.
 

 Gregory was the only member of the family who smoked unfiltered cigarettes. DNA tests on saliva from the unfiltered cigarette butt proved to be consistent with Gregory’s saliva. A stain on the cigarette butt was shown to be Gregory’s blood.
 

 Investigation revealed that on December 13, 1991, at approximately 10:45 a.m., someone called Cabela’s Sporting Goods Company and ordered nearly $1,200 worth of fishing gear for rush delivery. The gear was shipped to Gregory’s apartment. The
 
 *1490
 
 person who placed the order used William’s credit card number and agreed to pay an extra $133 for shipment on the next business day.
 

 Gregory told his sister-in-law that his father had allowed him to place the order with his father’s credit card and that he had reimbursed his father with cash to cover the cost of the order. However, when the gear was delivered, Gregory called his ex-wife, Carol Smith, to express his excitement over receiving the fishing equipment as an early Christmas gift from his father. Ms. Smith, Kathy Lisetor and Gary Milton, the victims’ other son, testified that such a gift was contrary to an agreement among the Milton family. William and Gwen had told all the children that because money was so tight, they would only be purchasing gifts for the grandchildren. Finally, there is evidence that the decedents had refused to loan money to Gregory shortly before they were murdered. May Buck, Gwen’s friend, testified that shortly before the murders Gwen indicated that one of her sons had asked her and her husband for $1,000, but they had refused his request. Gary Milton, the only other son, testified that he did not request such a loan. At the time of the crimes, Gregory had very little money, no job and no prospects.
 

 Gregory told Robert Schmidt, a sergeant with the Sparks Police Department, that on December 13, 1991, he got up at “midmorning,” went to the unemployment office, then to breakfast and thereafter returned to his apartment. He did not say where he was from that time until later in the evening, when he went to Hallelujah Junction, California, to get some unoxygen-ated gas for his truck. Hallelujah Junction is thirty-eight miles from Sparks. Between 10:30 p.m. and 11:00 p.m. of the same evening, a neighbor observed Gregory outside his apartment sitting in his truck with the engine running, staring forward for over an hour, as if in a trance. When the neighbor approached Gregory and the truck, Gregory did not acknowledge the neighbor, but continued staring forward “as if in a daze.” Gregory was not informed of his parents’ death until the next day.
 

 Gregory’s sister, Sharon Paradee, testified that Gregory had “a lot of hate in him,” and that in 1986, in response to her disclosure that their father had molested her, Gregory stated: “If it’s the last thing I do, I will kill him [William].” On July 4, 1991, in a conversation with Gary Milton, Gregory discussed favoritism in the family and angrily stated that as far as he was concerned, he was “dead last” (i.e., the least favored of all the children and grandchildren).
 

 Following a three-week jury trial, Gregory was convicted of two counts of first-degree murder with the use of a deadly weapon, one count of robbery with the use of a deadly weapon
 
 *1491
 
 and one count of grand larceny. Gregory was sentenced to four consecutive life sentences in the Nevada State Prison without the possibility of parole.
 
 [1]
 

 DISCUSSION
 

 Sufficiency of Evidence
 

 Gregory first insists that the evidence was insufficient to sustain the verdicts against him. This court has stated that in a criminal case where the jury has arrived at a guilty verdict, the relevant inquiry is ‘“whether, after viewing the evidence in the light most favorable to the prosecution,
 
 any
 
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.’” Koza v. State, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).
 

 Our review of the record reveals sufficient evidence to satisfy the standard indicated above. More specifically, we note that Gregory knew how to access the house with the spare key and that the crime scene revealed no evidence of forced entry. The spare key was later determined to be missing. Gregory’s bloodstained unfiltered cigarette was found in his father’s office, and it was Gwen’s nightly habit to gather up all cigarette butts in the house and place them in a can. Only non-traceable cash was taken from the home while other obvious, but traceable, valuables were disregarded. The testimony revealed that Gregory had asked for a $1,000 loan from his parents and his request was rejected. Moreover, Gregory, who was basically without funds and unemployed, provided contradictory stories of how he obtained the fishing gear, both of which seemed flawed; and his story about paying cash to his father as reimbursement for the credit purchase of the gear was not credible. Gregory’s declaration to his sister, vowing that he would one day kill his father “if it’s the last thing I do,” reflected an inordinate hatred for William. This long-standing expression of hatred was compounded by his bitter resentment over being “dead last” in the family order. Finally, the number of violent stabbings to both bodies was indicative of rage and hatred. All of this evidence and more, taken as a whole, provides a sufficient evidentiary foundation to support the verdict of the jury. This issue is without merit.
 

 
 *1492
 

 Reasonable Doubt Instruction
 

 Gregory challenges the constitutionality of the jury instruction on reasonable doubt given by the district court. This well-worn challenge is also without merit. We have repeatedly held that jury instructions on reasonable doubt given pursuant to NRS 175.211
 
 [2]
 
 are constitutional.
 
 See
 
 Lord v. State, 107 Nev. 28, 40, 806 P.2d 548, 556 (1991). As recently as 1994, this court specifically admonished district courts to follow the current statutory definition. Hutchins v. State, 110 Nev. 103, 112, 867 P.2d 1136, 1142 (1994). Accordingly, the district court’s instruction, which conformed to the statute, was proper.
 

 Circumstantial Evidence Instruction
 

 Gregory contends the district court erred in failing to give Gregory’s proffered circumstantial evidence instruction.
 
 [3]
 
 We have held that when a defendant’s theory of the case is supported by evidence, the defendant has the right to a jury instruction on the theory of his case; however, such a rule “does not give the defendant the absolute right to have his own instruction given, particularly when the law encompassed in that instruction is fully covered by another instruction.” Stroup v. State, 110 Nev. 525, 529, 874 P.2d 769, 771 (1994). In the present case, the district court’s instruction virtually tracks the Ninth Circuit Model Jury Instruction No. 3.06. The instruction adequately informed the jury on circumstantial evidence. Accordingly, the district court did not err in refusing to give Gregory’s instruction regarding circumstantial evidence.
 

 Advisory Verdict
 

 Gregory contends that the district court abused its discretion in
 
 *1493
 
 not giving the jury an advisory instruction to acquit. This court has said in construing NRS 175.381
 
 [4]
 
 that “‘[t]he granting of an advisory instruction to acquit rests within the sound discretion of the court.’” Lenz v. State, 97 Nev. 65, 66, 624 P.2d 15, 16 (1981) (quoting Geer v. State, 92 Nev. 221, 223, 548 P.2d 946, 947 (1976)). In the present case, the trial judge, in a post-trial conference, made clear his reasons for not giving the advisory verdict:
 

 When we got to the trial phase of this case, I think that a Judge’s role is to deliver a case as cleanly as possible to a jury, and that is essentially also the role of the trial counsel on both sides. I think it’s the jury’s role for the most part to make all the determinations of guilt and innocence, or else we wouldn’t have a system built around a jury system.
 

 It was primarily for that reason that I did not give an advisory verdict. I would give an advisory verdict only when my conscience is truly troubled by a result.
 

 I think this case was won, but not lost, in closing arguments. At the end of [the State’s] closing argument, I had for the first time myself a coherent picture of what I would call a signature or identity of this defendant as the perpetrator of these crimes.
 

 Although the judge stated that he wasn’t sure that he would have decided as the jury did, he also made it clear that he felt the jury was justified in arriving at its decision.
 

 
 *1494
 
 Based upon the record evidence linking Gregory to the crime, and given the discretionary nature of advisory verdicts, we conclude that the district court did not abuse its discretion by refusing to issue an advisory verdict to the jury.
 

 Deadly Weapon Enhancement
 

 Finally, Gregory contends that there is no basis in the record to support his enhanced sentences for use of a deadly weapon in the commission of the crimes. We are forced to agree.
 
 [5]
 
 In Zgombic v. State, 106 Nev. 571, 798 P.2d 548 (1990), this court overruled the “functional” test and applied the “inherently dangerous weapon” test for determining whether an instrumentality is a deadly weapon for purposes of NRS 193.165.
 
 [6]
 
 The “inherently
 
 *1495
 
 dangerous weapon” test means “that the instrumentality itself, if used in the ordinary manner contemplated by its design and construction, will or is likely to, cause a life-threatening injury or death.”
 
 Id.
 
 at 576-77, 798 P.2d at 551. Under
 
 Zgombic,
 
 it is the district court’s duty to determine whether the instrument is an inherently dangerous weapon, except “in a few close cases where the court cannot determine as a matter of law whether the weapon is or is not a deadly weapon, the judge will need to submit the entire issue to the jury after instructing it on the previously stated definition of a deadly weapon.”
 
 Id.
 
 at 577, 798 P.2d at 552.
 

 In
 
 Hutchins,
 
 this court discussed the classification of knives under the “inherently dangerous weapon” test, stating: “[Here] the State argues that scissors are analogous to a knife, something which could clearly be classified as a ‘deadly weapon’ even under the ‘inherently dangerous’ standard. . . . [I]n addition to their more commonplace uses, knives are often designed as weapons and have been so used throughout history.”
 
 Id.
 
 at 111, 867 P.2d at 1141. Although
 
 Hutchins
 
 allows for the possibility of finding that a knife is a deadly weapon, that case does not stand for the proposition that all knives are considered deadly weapons under the “inherently dangerous weapon” test. In determining whether a knife is a deadly weapon, the district court must consider the particular type of knife that was used in the crime and determine whether it satisfies the “inherently dangerous weapon” test.
 

 In the instant case, the district court gave the following instruction:
 

 A deadly weapon is any object, instrument or weapon which is used in such a manner as to be capable of producing, and likely to produce, death or great bodily injury.
 

 A knife is capable of being used as a deadly weapon. Such an instruction clearly follows the previously overturned “functional” test and constitutes reversible error with regards to the deadly weapon enhancements.
 

 CONCLUSION
 

 For the reasons discussed above, Gregory’s judgment of conviction is affirmed, but the enhanced consecutive sentences for use of a deadly weapon must be, in each instance, vacated. We accordingly remand this matter to the district court for the purpose of vacating the deadly weapon sentence enhancements. The judgment entered below is affirmed in all other respects.
 
 [7]
 

 [1]
 

 Gregory also received a thirty-year sentence on the charge of robbery with the use of a deadly weapon and a ten-year sentence on the charge of grand larceny. These two sentences were ordered to run concurrently with the first life sentence.
 

 [2]
 

 NRS 175.211 provides as follows:
 

 1. A reasonable doubt is one based on reason. It is not mere doubt, but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual, not mere possibility or speculation.
 

 2. No other definition of reasonable doubt may be given by the court to juries in criminal actions in this state.
 

 [3]
 

 On appeal, Gregory does not contend that the district court erred in instructing the jury on circumstantial evidence when a proper reasonable doubt instruction had already been given, nor could he do so, since he insisted at trial that a circumstantial evidence instruction be given.
 

 [4]
 

 NRS 175.381 provides as follows:
 

 1. If, at any time after the evidence on either side is closed, the court deems the evidence insufficient to warrant a conviction, it may advise the jury to acquit the defendant, but the jury is not bound by such advice.
 

 2. The court may, on a motion of a defendant or on its own motion, which is made after the jury returns a verdict of guilty, set aside the verdict and enter a judgment of acquittal if the evidence is insufficient to sustain a conviction. The motion for a judgment of acquittal must be made within 7 days after the jury is discharged or within such further time as the court may fix during that period.
 

 3. If a motion for a judgment of acquittal after a verdict of guilty pursuant to this section is granted, the court shall also determine whether any motion for a new trial should be granted if the judgment of acquittal is thereafter vacated or reversed. The court shall specify the grounds for that determination. If the motion for a new trial is granted conditionally, the order thereon does not affect the finality of the judgment. If the motion for a new trial is granted conditionally and the judgment is reversed on appeal, the new trial must proceed unless the appellate court has otherwise ordered. If the motion is denied conditionally, the defendant on appeal may assert error in that denial, and if the judgment is reversed on appeal, subsequent proceedings must be in accordance with the order of the appellate court.
 

 [5]
 

 We recognize that the legislature spoke on this subject in the last session, providing a new definition for “deadly weapon,” stating:
 

 As used in this section, “deadly weapon” means:
 

 (a) Any instrument which, if used in the ordinary manner contemplated by its design and construction, will or is likely to cause substantial bodily harm or death;
 

 (b) Any weapon, device, instrument, material or substance which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing substantial bodily harm or death; or
 

 (c) A dangerous or deadly weapon specifically described in NRS 202.255, 202.265, 202.290, 202.320, 202.350.
 

 1995 Nev. Stat. ch. 455, § 1 at 1431.
 

 However, the amendment is not controlling here because it does not apply to a crime committed before October 1, 1995. 1995 Nev. Stat. ch. 455, § 2 at 1431.
 

 [6]
 

 NRS 193.165 provides as follows:
 

 1. Except as otherwise provided in NRS 193.169, any person who uses a firearm or other deadly weapon or a weapon containing or capable of emitting tear gas, whether or not its possession is permitted by NRS 202.375, in the commission of a crime shall be punished by imprisonment in the state prison for a term equal to and in addition to the term of imprisonment prescribed by statute for the crime. The sentence prescribed by this section runs consecutively with the sentence prescribed by statute for the crime.
 

 2. This section does not create any separate offense but provides an additional penalty for the primary offense, whose imposition is contingent upon the finding of the prescribed fact.
 

 3. The provisions of subsections 1 and 2 do not apply where the use of a firearm, other deadly weapon or tear gas is a necessary element of such crime.
 

 4. The court shall not grant probation to or suspend the sentence of any person who is convicted of using a firearm, other deadly weapon or tear gas in the commission of any of the following crimes:
 

 (a) Murder;
 

 (b) Kidnaping in the first degree;
 

 (c) Sexual assault; or
 

 (d) Robbery.
 

 [7]
 

 The Honorable Cliff Young, Justice, did not participate in the decision of this appeal.