131 Nev., Advance Opinion 7

IN THE SUPREME COURT OF THE STATE OF NEVADA

HAREL ZAHAVI,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 59815

**FILED**

FEB 26 2015

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

Appeal from an amended judgment of conviction, pursuant to a jury verdict, of four counts of drawing and passing a check without sufficient funds in drawee bank with intent to defraud, presumptions of intent to defraud (felony), in violation of NRS 205.130 and NRS 205.132. Eighth Judicial District Court, Clark County; Valerie Adair, Judge.

*Affirmed.*

Nguyen & Lay and D. Matthew Lay, Las Vegas,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Steven S. Owens, Chief Deputy District Attorney, and Bernard B. Zadrowski, Deputy District Attorney, Clark County, for Respondent.

BEFORE THE COURT EN BANC.

SUPREME COURT
OF
NEVADA

(O) 1947A

3/12/15: Corrected per letter to publishers. CT

15-06129

## OPINION

By the Court, HARDESTY, C.J.:

Appellant Harel Zahavi was convicted of violations of NRS 205.130, Nevada's so-called bad-check statute, when $384,000 in casino markers, payable to four Las Vegas casinos, were returned for insufficient funds.

In this appeal, we must determine whether the district court erred when it refused to instruct the jury that a casino's knowledge of insufficient funds negates the intent-to-defraud element under NRS 205.130 or, alternatively, constitutes an affirmative defense. If not, we must consider whether NRS 205.130 violates the Nevada Constitution.

While we conclude that a casino's knowledge of insufficient funds may negate the intent to defraud, we find no basis for a separate jury instruction, or alternatively, an affirmative defense. Furthermore, we conclude that the district court did not commit any additional errors, and that NRS 205.130 is constitutional. As such, we affirm Zahavi's convictions.

### FACTS AND PROCEDURAL HISTORY

Beginning in the late 1990s, Zahavi began gambling, obtaining lines of credit, and executing markers at various Las Vegas casinos. In order to obtain credit and receive markers at a casino, the casino requires the patron to complete a credit application. The casino then obtains a credit report which shows a past history of the player and his play at other casinos, including any amounts owed in markers to other casinos. The credit application also requires the patron to provide bank account information and the casino often checks directly with the bank to determine the balances in those accounts. If the casino determines the

patron to be credit worthy, it grants a line of credit and the patron may obtain markers that can be exchanged on the casino floor for gaming chips. Each marker contains language that informs the patron that the marker is like a personal check and may be withdrawn at any time from the patron's bank account, and it must be signed by the patron before use. However, it appears that casinos generally do not immediately deposit the markers and often agree, as a courtesy to their customers, to hold gaming markers until a designated disposition date, or longer if the patron is working with the casino to pay off any remaining balance on the marker.

Over the years, Zahavi would regularly accumulate large amounts of debt to various Las Vegas casinos and then slowly pay back the money owed on the markers. Prior to the events that led to Zahavi's conviction in this case, no casino had ever deposited one of Zahavi's markers and had it returned for insufficient funds. In September 2008, Zahavi liquidated many of his available assets and paid approximately $700,000 worth of outstanding debt owed on various casino markers.

At issue in this matter is the execution of 14 casino markers, totaling $384,000, that were obtained on existing and new lines of credit by Zahavi between October and December 2008 at four Las Vegas casinos. In October 2008, Zahavi increased his existing line of credit at the Venetian Resort and Casino, and executed nine different markers at the Venetian and the Palazzo Hotel and Casino,[1] ranging from $2,000 to $50,000 each, totaling $184,000. When he signed each marker, Zahavi represented that he understood that the credit instrument was identical to

---

[1]The Palazzo and the Venetian are owned by the same corporation, and a customer may use the same line of credit at either casino.

a personal check and that it was payable upon demand. The evidence introduced during trial shows that at the time the Venetian and Palazzo extended Zahavi's line of credit and issued him the $184,000 worth of markers, they had Zahavi's credit report from August 2008 on file. The evidence showed he had an average of $25,000 to $50,000 in one bank account and an average of $50,000 to $75,000 in another. The evidence also showed actual amounts in the two accounts ranging from $7,500 to $10,000, and $100,000 to $250,000.[2] When Zahavi failed to timely pay the markers, they were presented for payment from Zahavi's bank accounts and returned for insufficient funds.

Also in October 2008, after completing a credit application and establishing a $100,000 credit line at the Hard Rock Hotel and Casino, Zahavi executed two $50,000 markers at the Hard Rock. Again, upon signing the markers, Zahavi represented that he understood the credit instrument was identical to a personal check and that the marker was payable upon demand. The Hard Rock obtained information concerning Zahavi's bank accounts from the Wynn Hotel and Casino, which reported that as of August, he had an average balance of between $40,000 and $60,000 in one account, and an actual balance of $7,000 to $9,000. The other account had an average balance of between $40,000 to $60,000, and an actual balance of $100,000 to $300,000. The Hard Rock also knew he had roughly $487,500 in outstanding markers but had no knowledge of his recent payments. Two days after issuing him the markers, the Hard Rock

_____

[2]When providing information to casinos, the banks often will not give specific dollar amounts in the accounts, but rather state the balance in more general terms, such as "medium five" or "low six." A Hard Rock employee testified that a "medium five" would be $40,000 to $60,000.

obtained actual bank statements from Zahavi, indicating a total balance of roughly $27,000 between the two accounts. Zahavi failed to timely repay his outstanding marker balance, and the Hard Rock presented the two markers for payment from Zahavi's bank accounts, both of which were returned for insufficient funds.

In December 2008, Zahavi then drew three additional markers, based on an existing line of credit established at Caesars Palace Hotel and Casino. In signing the markers, Zahavi made similar representations that the markers were payable on demand and he had sufficient funds. There was no evidence introduced during the trial that Caesars Palace had any knowledge of the present state of Zahavi's accounts and that the credit report they had on file for Zahavi dated back to 2005. After multiple collection efforts were made, Caesars presented the three markers, totaling $100,000, for payment from Zahavi's bank accounts, all of which were returned due to insufficient funds.

Upon receipt of the returned markers, all four casinos sent Zahavi a required ten-day demand letter requesting payment. Zahavi again failed to pay. Subsequently, all 14 unpaid markers were sent to the Clark County District Attorney's Office for criminal prosecution under the bad-check statute. The State filed an indictment against Zahavi for writing checks with insufficient bank funds with intent to defraud. The indictment included four counts, one for each casino from which Zahavi had executed the 14 markers: the Venetian, Palazzo, Hard Rock, and Caesars.

At trial, the district court gave jury instruction 18, over Zahavi's objection, which stated that "[w]hether a payee chooses to cash a check immediately or at a later date does not alter the character of the

instrument. The mere fact that a marker is held for a period of time prior to deposit does not convert the instrument into a post dated contract." Zahavi proposed, and the district court rejected, jury instructions stating that a casino's knowledge of insufficient funds negated Zahavi's intent to defraud or, alternatively, served as an affirmative defense. The jury found Zahavi guilty on all four counts. Zahavi now appeals.

## DISCUSSION

On appeal, Zahavi argues that: (1) the district court erred in instructing the jury that a casino's choice to hold a marker does not alter the marker into a post-dated contract; (2) the district court erred in refusing to give Zahavi's proposed jury instruction that a casino's knowledge of insufficient funds negates the intent-to-defraud element under NRS 205.130 or, alternatively, constitutes an affirmative defense; and (3) NRS 205.130 violates the Nevada Constitution.

*The district court did not err in instructing the jury that a casino's choice to hold markers does not alter the marker into a short-term loan or post-dated check*

"[W]hether the jury instruction was an accurate statement of the law is a legal question subject to de novo review." *Berry v. State*, 125 Nev. 265, 273, 212 P.3d 1085, 1091 (2009), *abrogated on other grounds by State v. Castaneda*, 126 Nev. ___, 245 P.3d 550 (2010). Zahavi argues that jury instruction 18 was a misstatement of the law because gaming markers are the equivalent of short-term loans or post-dated checks, and thus, are outside the purview of NRS 205.130.

At the time of Zahavi's markers, NRS 205.130(1) (2007) provided:

> Except as otherwise provided in this subsection and subsections 2 and 3, a person who willfully,

with an intent to defraud, draws or passes a check or draft to obtain:

> (a) Money;
>
> (b) Delivery of other valuable property;
>
> (c) Services;
>
> (d) The use of property; or
>
> (e) Credit extended by any licensed gaming establishment,
>
> drawn upon any real or fictitious person, bank, firm, partnership, corporation or depositary, when the person has insufficient money, property or credit with the drawee of the instrument to pay it in full upon its presentation, is guilty of a misdemeanor. If that instrument, or a series of instruments passed in the State during a period of 90 days, is in the amount of $250 or more, the person is guilty of a category D felony and shall be punished as provided in NRS 193.130. In addition to any other penalty, the court shall order the person to pay restitution.[3]

Jury instruction 18 states: "[t]he mere fact that a marker is held for a period of time prior to deposit does not convert the instrument into a post dated contract."

In *Nguyen v. State*, this court considered whether a gaming marker was a "check or draft" under NRS 205.130(1) and rejected the appellant's contention that "the practice of delaying payment of a marker renders the instrument a loan document." 116 Nev. 1171, 1176, 14 P.3d 515, 518 (2000). Looking to the definitions of "check" and "draft" in the

---

[3]NRS 205.130(1) was amended in 2011 and now states that an instrument's amount must be greater than $650, not $250. 2011 Nev. Stat., ch. 41, § 11, at 162-63. This change in law is irrelevant to our rulings here.

Uniform Commercial Code, this court determined that "NRS 205.130 applies to instruments that are drawn upon a bank, payable on demand, signed by the payor, and which instruct the bank to pay a certain amount to the payee." *Id.* at 1175, 14 P.3d at 518. The gaming markers at issue in *Nguyen* satisfied that definition. *Id.* The court also reasoned that "[w]hether an obligee chooses to cash a check immediately or at a later date does not alter the character of the instrument." *Id.* at 1176, 14 P.3d at 518. This court further "decline[d] to hold . . . that . . . markers [are] 'pre-dated' checks, that is, checks held by the casinos pursuant to a contract of future deposit. . . . The mere fact that markers are held for a period of time prior to deposit does not evidence such a contract." *Id.* at 1176 n.6, 14 P.3d at 518 n.6.

Zahavi acknowledges our holding in *Nguyen* but argues that in *Nguyen* we left open the possibility that a marker may be deemed a short term loan if both parties mutually understood and agreed to such terms. He points to the following language in *Nguyen* to support that proposition: "[f]urther, there is no evidence that [appellant] and the casinos understood the marker to effect a contract for a loan." *Id.* at 1176, 14 P.3d at 518. We disagree with Zahavi's reading of *Nguyen* and take this opportunity to clarify our holding in that case.

First, we note that the language Zahavi refers to in *Nguyen* was dicta. This court was merely pointing to a flaw in the appellant's argument, which was the lack of any evidence to support his claim of an agreement to make a short term loan. However, to the extent *Nguyen* can be read as Zahavi urges, we clarify that *Nguyen* does not stand for the proposition that a casino marker bearing the phrase "payable upon demand" or similar language may be deemed a post-dated contract if both

SUPREME COURT
OF
NEVADA

(O) 1947A

8

parties mutually understood and agreed that the marker would be held for a period of time prior to deposit.

The casino markers signed by the appellant in *Nguyen*, as well as the markers in Zahavi's case, all included some form of language indicating the marker was "payable upon demand," or was "identical to a personal check." Thus, Zahavi's argument—that the course of dealing between him and the casinos somehow demonstrates a mutual understanding that the markers would not be immediately deposited—fails in the face of the clear and unambiguous language of the markers. *See Davis v. Beling*, 128 Nev. ___, ___, 278 P.3d 501, 515 (2012) (stating that language that is "clear and unambiguous . . . will be enforced as written"). The result would be different only if the language of the marker somehow expressed that the casino would hold the marker for a period of time prior to deposit, thus removing it from the category of "check or draft" as defined in *Nguyen*. 116 Nev. at 1175, 14 P.3d at 517-18. Therefore, we conclude that jury instruction 18 is an accurate statement of the law, and the district court did not err in giving that instruction.

*The district court did not err in refusing to give Zahavi's proposed jury instruction that a casino's knowledge of insufficient funds negates the intent-to-defraud element or, alternatively, is an affirmative defense*

"The district court has broad discretion to settle jury instructions, and this court reviews the district court's decision for an abuse of that discretion or judicial error." *Crawford v. State*, 121 Nev. 744, 748, 121 P.3d 582, 585 (2005). "An abuse of discretion occurs if the district court's decision is arbitrary or capricious or if it exceeds the bounds of law or reason." *Jackson v. State*, 117 Nev. 116, 120, 17 P.3d 998, 1000 (2001). "It is well established that a defendant is entitled to a jury instruction on his theory of the case, so long as there is evidence to support it," *Hoagland*

 

*v. State*, 126 Nev. ___, ___, 240 P.3d 1043, 1047 (2010), and it correctly states the law, *see Crawford*, 121 Nev. at 748, 121 P.3d at 585. This rule, however, "does not give the defendant the absolute right to have his own instruction given, particularly when the law encompassed in that instruction is fully covered by another instruction." *Milton v. State*, 111 Nev. 1487, 1492, 908 P.2d 684, 687 (1995) (internal quotations omitted).

Zahavi contends that the casinos had knowledge of his insufficient funds and inability to pay back the 14 gaming markers he obtained. Nevada's bad check statute, NRS 205.130(1), prohibits a person "with an intent to defraud," from drawing or passing a check or draft to obtain credit extended by a licensed gaming establishment (commonly in the form of a casino marker). Here, the relevant inquiry is whether the district court should have instructed the jury that a casino's knowledge of insufficient funds in a casino patron's bank accounts at the time of the issuance of a marker negates the intent-to-defraud element of NRS 205.130(1)(e) or, alternatively, constitutes an affirmative defense.

Interpreting NRS 205.130 requires this court to first look to the "statute's plain meaning." *State v. Lucero*, 127 Nev. ___, ___, 249 P.3d 1226, 1228 (2011). "[W]hen a statute 'is clear on its face, a court can not go beyond the statute in determining legislative intent.'" *Id.* (quoting *Robert E. v. Justice Court of Reno Twp.*, 99 Nev. 443, 445, 664 P.2d 957, 959 (1983)). When construing various statutory provisions, which are part of a "scheme," this court must interpret them "harmoniously" and "in accordance with [their] general purpose." *Washington v. State*, 117 Nev. 735, 739, 30 P.3d 1134, 1136 (2001).

NRS 205.130 is silent as to whether a licensed gaming establishment's knowledge that a patron had insufficient funds at the time

he or she executed markers will negate the element of intent to defraud or may constitute an affirmative defense. The statutory provisions under NRS 205.132 explicitly provide three instances when the element of intent to defraud may be presumed under Nevada law: if the check is drawn on an account that does not exist; payment is refused by the drawee upon presentment of the check; and notice of refusal of payment that is mailed to the drawer by registered or certified mail is returned because of nondelivery. NRS 205.132(1). However, the statutory provisions under NRS 205.130 make no reference to negating the element of intent to defraud.

Zahavi asserts that other jurisdictions have held that bad check statutes similar to NRS 205.130 provide that an element of intent to defraud may be negated by a payee's knowledge of insufficient funds. *See State v. Zent*, 376 P.2d 861, 863 (Ariz. 1962) (explaining that a person's disclosure to a payee that he or she does not have sufficient funds to satisfy an executed check fails to constitute criminal intent to defraud); *People v. Poyet*, 492 P.2d 1150, 1152 (Cal. 1972) (finding that "with disclosure there can be no deception of a present insufficiency of funds" (emphasis omitted)). The West Virginia Supreme Court went further, holding that where a business has *reason* to believe there are insufficient funds, such belief negates the fraudulent intent. *State v. Orth*, 359 S.E.2d 136, 139-40 (W. Va. 1987) (after several checks executed to a dog racing track were returned due to insufficient funds, and the track continued to accept checks from the patron, the court held that the track "had reason to believe the appellant did not have sufficient funds on deposit"), *overruled on other grounds by State v. Phillips*, 520 S.E.2d 670, 678 (W. Va. 1999).

The State argues that these cases are not applicable because Nevada's law regarding gaming markers is unique, and the cases from other states, aside from West Virginia, all involve an affirmative disclosure of insufficient funds by the defendant in the context of a personal check. Interestingly, the State also highlights the difference between personal checks and gaming markers—the payee on a personal check has no ability to verify the defendant's credit history with the company or verifying funds in the defendant's bank account, whereas casinos uniquely rely on other sources to determine these factors. Thus, in the case of a personal check, knowledge of insufficient funds can generally only be gained if the payee affirmatively discloses it. However, in the unique situation of casino gaming markers, the casino may gain this knowledge through other means.

As such, we determine that the element of "intent to defraud" under NRS 205.130 may be negated by a showing that the casino had knowledge that the person obtaining the marker did not have sufficient funds to cover the marker at the time it was executed. The factors in determining whether intent may be negated include what the payor represented and what information was available to the payee. We decline to go as far as the *Orth* court, which stated the intent to defraud element may be negated if the payee had "reason to believe." Merely because the casinos have the ability to research a patron's financial status, they are under no obligation to do so, and under the *Orth* standard, the statute would be rendered useless as every gambler who failed to pay his markers would simply argue that the casino had "reason to believe" he could not pay his markers by virtue of information potentially available to the casinos.

Because we determine that the "intent to defraud" element may be negated by a disclosure of insufficient funds to the payee, Zahavi was entitled to have the jury so instructed if there was proof in the record supporting the instruction, see *Hoagland*, 126 Nev. at ___, 240 P.3d at 1047, and it was not adequately covered in other instructions, *Milton*, 111 Nev. at 1492, 908 P.2d at 687.

Under the first factor, Zahavi did not affirmatively represent he had insufficient funds. With the exception of *Orth*, unlike the cases cited above from other jurisdictions where the defendant personally informed the payee that he had insufficient funds and would not be able to cover the check at that time, here Zahavi failed to affirmatively disclose to the casinos that he lacked sufficient funds in either of his accounts. *See Zent*, 376 P.2d at 863; *Poyet*, 492 P.2d at 1152; *see also People v. Jacobson*, 227 N.W. 781, 782 (Mich. 1929) (holding that plaintiff's knowledge that defendant did not have funds in the bank negated any fraudulent intent). In fact, at the time Zahavi signed the markers, he guaranteed to the casinos that there were sufficient funds available, such that the markers were payable upon demand and could be executed at any time.

The second factor (information available to the payee) does not weigh in Zahavi's favor. Contrary to Zahavi's argument that the casinos had knowledge of his insufficient funds, the evidence indicates that at the time the casinos extended the line of credit, their records supported Zahavi's affirmative representation that he had sufficient funds. At trial, the executive director of cage and credit operations for the Hard Rock testified that prior to granting Zahavi credit and allowing him to take out $100,000 in markers, the Hard Rock obtained a credit report, as well as information from other casinos revealing that Zahavi had a total of

SUPREME COURT
OF
NEVADA

(O) 1947A

13

$487,500 in outstanding markers. The Hard Rock did not know, however, whether Zahavi had made payments on this outstanding balance. Further testimony revealed that one month prior to issuance of the markers, the Hard Rock also knew that the balances in the two bank accounts provided by Zahavi had respective average balances of roughly $7,000 to $9,000, and $100,000 to $300,000.[4] It was not until two days after Zahavi signed the markers representing that he had sufficient funds that the Hard Rock learned he only had approximately $27,000 between the two accounts.

Additionally, the executive director of casino credit and director of collections at the Venetian and Palazzo testified that they had records dating from August 2008 that indicated Zahavi had actual balances in his accounts of $7,500 to $10,000 and $100,000 to $300,000. They further testified that the balances in Zahavi's accounts would have been enough to cover the $184,000 in markers that they extended to him.

Further, employees of Caesars Palace testified that they had no knowledge of his present accounts, with the most recent credit report in their possession dating back to 2005. Because Zahavi failed to make an affirmative disclosure to the casinos and the casinos had no present knowledge of his insufficiency of funds at the time the markers were executed, we conclude that there was no evidence to negate the intent-to-defraud element, and therefore the district court did not abuse its discretion by refusing the instruction.

Additionally, the district court did not abuse its discretion in rejecting Zahavi's proposed supplemental instruction on the intent to

---

[4]The Hard Rock obtained Zahavi's bank information from the Wynn Las Vegas. The Wynn informed the Hard Rock that the bank account amounts had last been verified in August 2008.

defraud because it was adequately addressed by the other instructions. In pertinent part, jury instruction 17 informed the jury:

> To act with the "intent to defraud" means to act knowingly and with the specific intent to deceive or cheat someone, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to oneself or another to the detriment of a third party.

Zahavi was permitted to argue his theory regarding the casino's knowledge of his insufficient funds and the jury instructions given adequately addressed this theory.

We further decline to hold that Zahavi was entitled to an instruction on an affirmative defense. None of the cases cited by Zahavi characterize the payee's knowledge of insufficient funds as establishing an affirmative defense, and therefore, we reject this argument as an inaccurate statement of the law. *See Zent*, 376 P.2d at 863; *Poyet*, 492 P.2d at 1152; *Jacobson*, 227 N.W. at 782. Thus, we conclude that the district court did not abuse its discretion in failing to instruct the jury on negating the intent-to-defraud element or, alternatively, in refusing to instruct the jury that it was an affirmative defense.

*NRS 205.130 is constitutional*

A de novo standard of review is applied to issues of constitutionality. *State v. Colosimo*, 122 Nev. 950, 954, 142 P.3d 352, 355 (2006). This court presumes "that statutes are constitutional," and "the party challenging a statute has the burden of making a clear showing of invalidity." *State v. Castaneda*, 126 Nev. ___, ___, 245 P.3d 550, 552 (2010) (internal quotations omitted). Zahavi challenges the constitutionality of NRS 205.130, arguing that it violates the provision in the Nevada Constitution that prohibits imprisonment for failing to pay a

debt, except in cases of fraud. He bases his argument on the fact that NRS 205.130 only requires the "intent to defraud" and not the other elements of common law fraud, such as reliance. The State, however, argues that the statute is constitutional because it punishes a fraudulent act as encapsulated in the first element, not the mere accumulation of debt, and that this court has already determined that "intent to defraud" is sufficient to pass constitutional muster. We agree.

The Nevada Constitution states that "there shall be no imprisonment for debt, except in cases of fraud." Nev. Const. art. 1, § 14. NRS 205.130(1)(e) provides that "a person who willfully, with an intent to defraud, draws or passes a check or draft to obtain . . . [c]redit extended by any licensed gaming establishment" above a certain amount "is guilty of a . . . felony."[5] "The elements of the crime of issuing a check against

_____

[5]Records of the 1863 Constitutional Convention suggest this section of the Nevada Constitution has its origins in article 1, section 22 of the Indiana Constitution. The language referring to imprisonment for debt is identical, *compare* Nev. Const. art. 1, § 14, *with* Ind. Const. art. 1, § 22, and was proposed at the convention by James Corey, an individual with roots in Indiana. *See* Andrew J. Marsh, Samuel L. Clemens & Amos Bowman, *Reports of the 1863 Constitutional Convention of the Territory of Nevada*, 171, 470 n.36 (William C. Miller et al. eds., 1972). As such, we find cases interpreting this section of the Indiana Constitution informative. Although Indiana's bad/check statute is distinct from that of Nevada, the Indiana Supreme Court has interpreted statutes containing the "intent to defraud" language present in NRS 205.130 as constitutional. *See Clark v. State*, 84 N.E. 984, 985 (Ind. 1908) (finding that a statute prohibiting an individual from obtaining food or lodging with the intent to defraud an innkeeper did not violate the state constitution.); *Lower v. Wallick*, 25 Ind. 68, 73 (1865) ("If it had been the intention of the convention to abolish imprisonment for every moneyed liability, in criminal as well as civil cases, other terms and phrases would have been used.").

insufficient funds are (1) intent to defraud, (2) the making or passing of a check for the payment of money, and (3) without sufficient funds in the drawee institution to cover said check in full upon its presentation." *Garnick v. First Judicial Dist. Court*, 81 Nev. 531, 536, 407 P.2d 163, 165 (1965).

This court has previously held that a criminal statute allowing a defendant to be arrested for removing or disposing of his property with the intent to defraud his creditors did not conflict with Nevada Constitution article 1, section 14's provision against imprisonment for debt, except in cases of fraud. *Ex parte Bergman*, 18 Nev. 331, 341-42, 4 P. 209, 216 (1884).[6] Further, the court expressed that "'the immunity contemplated by the second clause would be confined to debts or liabilities growing out of contracts, and not to liabilities resulting from crimes or torts.'" *Id.* at 342, 4 P. at 216 (quoting *McCool v. State*, 23 Ind. 127, 131 (1864) (referencing its own state constitution's prohibition against "imprisonment for debt, except in case of fraud")).

Other jurisdictions have also reviewed the constitutionality of convicting a defendant under a bad-check statute under state constitutions that maintain similar language to Nevada Constitution article 1, section 14, and have held that including only the intent-to-defraud element of fraud in a criminal statute did not violate a constitutional prohibition against imprisonment for debt. *See State v. Meeks*, 247 P. 1099, 1101 (Ariz. 1926) ("Because one who gives a check

---

[6]Similar to NRS 205.130, the statute at issue in *Bergman* included only "intent to defraud," and did not reference reliance or other common law elements. *See* I Nev. Compiled Laws, § 73 (1873) (current version codified as NRS 31.480).

with the intent to defraud, knowing he has no funds to meet it when presented, may be punished, does not mean that he may be imprisoned for debt, but rather for committing an offense based upon fraud."); *Ennis v. State*, 95 So. 2d 20, 23-25 (Fla. 1957) (holding that a state statute criminalizing the act of drawing a check from a bank account when insufficient funds exist and requiring the element of intent to defraud did not violate state constitutional provision against imprisonment for debt); *State v. Laude*, 654 P.2d 1223, 1228 (Wyo. 1982) (holding that "criminal intent to deceitfully issue an insufficient funds check [was] an essential element of the crime" of committing fraud by check and that a statute prohibiting such offense was not a violation of the state's constitutional ban "against imprisonment for debt"). Based on our prior decisions, and persuasive authority from other jurisdictions with similar constitutional prohibitions, we conclude that NRS 205.130 does not violate article 1, section 14 of the Nevada Constitution because Zahavi's conviction is based on committing a fraudulent act and not on incurring a debt.[7]

---

[7]Zahavi also argues that NRS 205.130 violates the United States Constitution. U.S. Const. amend. XIII, § 1 ("Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."). However, he offers no further analysis or authority for this argument, instead focusing on the argument under the Nevada Constitution. We thus decline to address this argument. *See Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006) (declining to consider arguments not supported by relevant authority and cogent argument).

Accordingly, we affirm Zahavi's judgment of conviction.

_____, C.J.
Hardesty

We concur:

_____, J.
Parraguirre

_____, J.
Douglas

_____, J.
Cherry

_____, J.
Saitta

_____, J.
Gibbons

_____, J.
Pickering

SUPREME COURT
OF
NEVADA

(O) 1947A

19